IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| ROBERT CHILDRESS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:09CV0024 |
| | ) | |
| MICHAEL ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Robert Childress, brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

**PROCEDURAL HISTORY**

Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on March 7, 2006 (protective filing date February 21, 2006), alleging a disability onset date of July 8, 2004. (Tr. 86, 89).[1] He later amended his alleged onset date of disability to February 27, 2006. (Tr. 150.)

---

[1] Transcript citations refer to the administrative record.

Plaintiff's application was denied initially and upon reconsideration. (Tr. 44-47.) Thereafter, he requested a hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. 14.) The hearing took place on October 25, 2007, and Plaintiff attended with his attorney. (Id.) Although a vocational expert ("VE") did not attend the hearing, the ALJ and Plaintiff's attorney submitted interrogatories and supplemental questions to a VE after the hearing, and the VE's responses served as vocational evidence underlying the ALJ's decision. (Tr. 14.) The ALJ ultimately determined that Plaintiff was not disabled within the meaning of the Act, (Tr. 25), and on December 19, 2008, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review. (Tr. 1.)

In making his disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.
>
> 2. The claimant has not engaged in substantial gainful activity since February 27, 2006, his amended alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> 3. The claimant has the following severe impairments: history of coronary artery disease with placement of stents in February 2006; emphysema/chronic obstructive pulmonary disorder (COPD); hypertension; depression secondary to general medical condition . . . ; and a history of alcohol abuse (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart

> P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the claimant has the physical residual capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he should never climb ropes, scaffolding, or ladders; should avoid all exposure to working around unprotected heights or hazardous machinery; should avoid concentrated exposure to working around respiratory irritants, temperature extremes, and high humidity. He retains the mental residual functional capacity to perform simple routine repetitive tasks on a sustained basis.

(Tr. 16-17, 19.)

In light of the above findings regarding residual functional capacity ("RFC"), the ALJ determined that Plaintiff was unable to perform his past relevant work in the stone cutting industry. (Tr. 22.) He found that transferability of job skills was not an issue in the case, but added that Plaintiff had a limited education and could communicate in English. (Id.) Finally, because Plaintiff was 48 years old on his amended alleged onset date, the ALJ noted that he was regulatorily defined as "a younger individual age 18-49." (See id.)(citing 20 C.F.R. §§ 404.1563 and 416.963). Based on these factors, Plaintiff's RFC, and the VE's responses to interrogatories and supplemental questions, the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 23)(citing 20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c), and 416.966). Accordingly, the ALJ decided that Plaintiff was not under a "disability," as defined in the Act, from his amended alleged onset date of February 27, 2006, through the date of the decision. (Tr. 25.)

**DISCUSSION**

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." Mastro, 270 F.3d at

176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In confronting the issue so framed, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration has . . . promulgated . . . detailed regulations incorporating long-standing medical-vocational

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This process has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Social Security Admin., 174 F.3d 473, 475 n.2 (1999).[3] A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and

---

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

-6-

two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')."  Id. at 179.[4]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled.  Id. at 179-80.  However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job."  Hall, 658 F.2d at 264-65.  If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled.  Hines, 453 F.3d at 567.[5]

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations."  Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)."  Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)."  Hines, 453 F.3d at 562-63.

[5] A claimant thus can qualify as disabled via two paths through the five-step sequential evaluation process.  The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five.  Some
(continued...)

## Assignment of Error

Plaintiff now argues that substantial evidence does not support the ALJ's decision at step five of the sequential evaluation process ("SEP"). Specifically, he claims that the ALJ improperly

> disregarded hypothetical questions posed to the VE by claimant's attorney because the limitations expressed therein were not found to be [an] accurate nor a valid assessment of claimant's functional limitations. In order to make this finding, the ALJ had to determine that the examining physicians' opinions were not consistent with the records, and that the non-examining physicians' opinions were consistent.

(Docket Entry 11, p. 6.) By doing so, Plaintiff contends, the ALJ failed to give the opinions of his treating physicians greater weight than the opinions of non-treating physicians as required by 20 C.F.R. §§ 404.1527(d)(1) and 416.927(d)(1), better known as the "treating physician rule."

The treating physician rule generally requires an ALJ to give controlling weight to the opinion of a treating source as to the nature and severity of a claimant's impairment. 20 C.F.R. §§ 404.1527(d) and 416.927(d). In other words, treating physicians' opinions generally play the dominant role in establishing a claimant's RFC. This special status stems from the ability of treating sources to

---

⁵(...continued)
short-hand judicial characterizations of the sequential nature of the five-step disability evaluation appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2). The rule also recognizes, however, that not all treating sources are created equal. The nature and extent of each treatment relationship may appreciably temper the weight an ALJ affords it. 20 C.F.R. §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii); see also Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 544 (6th Cir. 2004) (listing specific factors an ALJ must consider to determine what weight to give a medical opinion); Havice v. Chater, 105 F.3d 669, 1997 WL 8852, at *6 (10th Cir. 1997) (same). Moreover, as subsections (2) through (4) of the treating physician rule describe in great detail, a treating source's opinion must be both well-supported by medical signs and laboratory findings and consistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(d) and 416.927(d). "[I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590; accord Mastro, 270 F.3d at 178.

In the present case, neither the nature of Plaintiff's treatment relationships with the physicians in question nor the other evidence of Plaintiff's condition support his arguments. Plaintiff first contends that the ALJ gave insufficient weight to the opinion of Dr. Michelle Nichols, who assessed physical

-9-

limitations relating to Plaintiff's cardiac and respiratory impairments. Notably, Dr. Nichols determined that Plaintiff's coronary artery disease ("CAD") rated as New York Heart Association ("NYHA") class III, defined as "'marked limitation in activity due to symptoms, even during less than ordinary activity (i.e., walking short distances, 20-100 meters) comfortable only at rest.'" (Tr. 153 (quoting The Criteria Committee of the New York Heart Association, Nomenclature and Criteria for Diagnosis of Diseases of the Heart and Great Vessels, 253-56 (9th ed. 1994)); see also Tr. 162, 202.) The VE, when asked about Plaintiff's ability to work, "[i]f this were found to be an accurate assessment," responded that such a limitation would render Plaintiff "unable to maintain full-time, competitive employment in any job, at any level of physical demand in the labor market." (Tr. 165-66.)

The ALJ, however, ultimately determined that Dr. Nichols' diagnosis was not an accurate assessment of Plaintiff's impairment given the evidence as a whole. As he explained:

> Dr. Nichols' opinion regarding the claimant's NYHA classification and the severity of his respiratory symptoms was based upon a one-time examination and her reliance upon the claimant's subjective complaints and behavior, rendering her opinion regarding the severity of the claimant's CAD and COPD on that date inconsistent with the remaining evidence of record. Furthermore, the value of Dr. Nichols' opinion is lessened by the fact of the results of the DLCO test[6] ordered by Disability Determination Services after seeing her report and the inconsistency between the claimant's presentation during

---

[6] The DLCO test measures the capacity of one's lungs to diffuse carbon monoxide. It provides an objective measurement of lung function. See 20 C.F.R. Part 404, Subpt. P, Appendix I, § 3.00(F)(1).

-10-

>his consultative evaluation and all other evidence of record.

(Tr. 24) (footnote added).

In short, the ALJ found that Dr. Nichols' opinion contained none of the indicia which would entitle it to controlling weight under the treating physician rule. First, the ALJ noted that Dr. Nichols only examined Plaintiff in a consultative capacity on a single occasion. (Tr. 24.) Thus, her opinion failed to provide the "longitudinal picture" of Plaintiff's condition anticipated by 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).

Second, Dr. Nichols based her diagnosis entirely on Plaintiff's self-reported symptoms, a review of his medical history, and a one-time physical examination. (See Tr. 199-203.) This approach ultimately reduced the weight of Dr. Nichols' opinion in two ways. As stated above, a treating source's opinion must be both (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2).

Here, the absence of laboratory, x-ray, or other supporting, objective bases for Dr. Nichols' diagnosis undermined its value under the first requirement. Notably, her only clinical evidence, in the form of Plaintiff's physical exam, revealed normal cardiovascular and respiratory findings, despite Plaintiff's shortness of breath while walking during the examination. (Tr. 201.) Dr. Nichols thus provided little more perspective on

Plaintiff's condition than a non-examining physician could offer. Moreover, contrary objective medical evidence, including normal range DLCO results just three weeks after Dr. Nichols' exam (Tr. 206) and normal echocardiogram and stress Cardiolite studies several months later (Tr. 355-56), then cast further doubt on the validity of her conclusions.

Plaintiff argues against a finding of inconsistency, claiming that "the record is replete with references to the severity of [his] shortness of breath and COPD" and that "[e]mergency room visits document the need for supplemental oxygen therapy and emergency nebulizer treatment." (Docket Entry 11 at 6.) In addition, Plaintiff maintains that his "cardiologist documented his shortness of breath and resulting [l]imitations in distance he could walk." (Id.) Ultimately, none of these contentions bring Dr. Nichols' diagnosis in line with the substantial evidence in Plaintiff's case record.

The ALJ's decision acknowledged that Plaintiff suffers from COPD, emphysema, and CAD, which, along with other conditions, limit him to light work with further restrictions as to heights and respiratory irritants. As such, there is no question that Plaintiff suffered from significant shortness of breath or that the ALJ took this into account when formulating Plaintiff's RFC. Instead, the issue here is whether substantial evidence supports Dr. Nichols' assessment of the severity of Plaintiff's respiratory symptoms and his classification as NYHA class III, a diagnosis that

would prevent Plaintiff from working at all.  A review of the evidence supports the ALJ's determination that it does not.

Significantly, nearly all reports of shortness of breath appearing in Plaintiff's records - including the reports "documented" by his cardiologist[7] - merely record Plaintiff's self-reported symptoms.  (See, e.g., Tr. 355.)  Although Plaintiff's emergency nebulizer treatments do provide objective evidence of his pulmonary problems, Plaintiff's references to his need for supplemental oxygen fail to tell the whole story.  Of the three instances cited by Plaintiff, one involved hospitalization for pneumonia (Tr. 168) and the other two involved precautionary measures.  In those two cases, Plaintiff's oxygen saturation levels were 93% and 98%, respectively, on room air alone.  (Tr. 326, 365.)

Simply put, the evidence cited by Plaintiff fails to validate Dr. Nichols' diagnosis of debilitating heart and respiratory impairments, and substantial evidence supports the ALJ's decision to disregard Plaintiff's hypothetical question based on Dr. Nichols' opinion.

Plaintiff next argues that the ALJ afforded insufficient weight to the mental assessments of Dr. Craig Hunt.  Specifically,

---

[7] Plaintiff's reference to his cardiologist's evaluation is particularly illuminating.  As a specialist who treated Plaintiff on multiple occasions, Dr. Tamas Balogh's evaluation is entitled to greater weight than the opinion of Dr. Nichols, a non-specialist, one-time examiner.  20 C.F.R. § 404.1527(d)(2)(i), 404.1527(d)(5), 416.927(d)(2)(i), 416.927(5).  Unlike Dr. Nichols, Dr. Balogh routinely performed resting 12-lead electrocardiograms during Plaintiff's appointments in addition to performing physical exams and reviews of his outside tests.  (Tr. 350-357.)  From this information, Dr. Balogh concluded that Plaintiff's CAD was well-controlled on medical therapy.  (See Tr. 350, 353, 356.)

Plaintiff alleges that the ALJ improperly disregarded Dr. Hunt's conclusion "that [Plaintiff] might experience significant difficulty remembering new information and significant difficulty retrieving recently learned information." (Tr. 153.) The VE, when asked about Plaintiff's ability to work "[i]f this were found to be an accurate assessment" of Plaintiff's mental abilities, responded, as she did with Dr. Nichols' assessment, that such a limitation would render Plaintiff "unable to maintain full-time, competitive employment in any job, at any level of physical demand in the labor market." (Tr. 165-66.)

However, the ALJ ultimately determined that the "conclusions" summarized by Plaintiff's counsel in his hypothetical question did not accurately reflect Dr. Hunt's diagnosis, let alone Plaintiff's condition given the evidence as a whole. Significantly, the above findings only appear without modification, as Plaintiff presented them to the VE, in the "Test Results" section of Dr. Hunt's report. In contrast, Dr. Hunt assimilates all available information on Plaintiff's condition, including his short-term memory deficits, into an overall assessment of his abilities in the "Summary and Conclusions" section of the report. (See Tr. 24.) Indeed, Dr. Hunt's report contains the following disclaimer regarding test results:

> Psychological test results presented below are hypotheses and should not be used by the reader of this report in isolation from other information in this matter. The interpretive statements are actuarial predictions based on the results of the test. Although the test results are presented in an affirmative manner, they are probabilistic in nature and may require modification

>based on other clinical data. The summary section will
>provide any such modifying statements.

(Tr. 214.)

In this instance, Dr. Hunt's summary recaps the extent of Plaintiff's memory deficits, as set out in the test results, but concludes that Plaintiff "does appear to have the intellectual capacity to perform simple, routine, repetitive tasks ["SRRTs"] as well as understand and follow simple instructions based on his presentation and test scores." (Tr. 218.) Oddly, Plaintiff attempts to parse out Dr. Hunt's opinions regarding Plaintiff's memory and recall from those regarding his ability to perform SSRTs. According to Plaintiff, "[t]he ALJ appears to adopt certain conclusions of the psychological testing (i.e., the conclusion that the claimant could perform S[R]RTs), but dismisses other conclusions of the testing (i.e., that the claimant would have significant difficulty with memory and recall)." (Docket Entry 11 at 7.) In fact, a plain language reading of Dr. Hunt's summary reveals that he clearly concluded Plaintiff retained the ability to perform SRRTs *despite* his difficulties with retention and rate of learning. (Tr. 218.) Dr. Hunt did not engage in any arbitrary or inconsistent analysis of the test results.

Moreover, and again contrary to Plaintiff's assertions,[8] Plaintiff obtained a second psychological evaluation less than a week after his evaluation by Dr. Hunt. Dr. Brett Fox, who

---

[8] Plaintiff claims that the ALJ's reasoning "pattern appears arbitrary because no other evidence of mental functioning exists in the file." (Docket Entry 11 at 7.)

performed the subsequent evaluation, also concluded that Plaintiff could perform SRRTs despite marginal recent memory and lower than normal scores in immediate retention and recall. (Tr. 243-44.) In short, the findings and conclusions of Drs. Hunt and Fox are entirely consistent with one another and with the ALJ's mental RFC assessment. Plaintiff's hypothetical question, in comparison, failed to encompass all aspects of his mental abilities and limitations as set out by both cited experts in this case. As such, substantial evidence supports the ALJ's decision at step five of the SEP to disregard the VE's answer to that question.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's motion for summary judgment (Docket Entry 10) seeking a reversal of the Commissioner's decision be **DENIED**, that Defendant's motion for judgment on the pleadings (Docket Entry 12) be **GRANTED**, and that this action be dismissed with prejudice.

                                            /s/ L. Patrick Auld
                                                **L. Patrick Auld**
                              **United States Magistrate Judge**

December 28, 2011